UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA,    : | |
|     Plaintiff,    : | |
| : | |
| v.    : | File No. 1:10-cr–100-jgm-1 |
| : | |
| SARA ROBINSON,    : | |
|     Defendant.    : | |
| _____    : | |

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS
(Doc. 20)

I.    Introduction

Defendant Sara Robinson (Robinson or Ms. Robinson) is charged with possessing with intent to distribute oxycodone in violation of 21 U.S.C. § 841.  (Doc. 1.)  Robinson moves to suppress statements and other evidence.  She argues her Fifth and Sixth Amendment constitutional rights were violated so her statements and any evidence discovered by the police must be suppressed.  (Doc. 20.)  The government opposes the motion.  (Doc. 21.)  The Court held an evidentiary hearing on April 20, 2011.  Robinson and the government filed further briefing after the hearing.  (Docs. 27, 28.)  In its briefing, the government raised a new argument and the Court ordered a response.  Defendant timely complied.  (Doc. 30.)

For the reasons stated below, the Court grants Defendant's motion.

II.    Background

The following facts are taken from the evidence presented at the hearing held on April 20, 2011, and from the other documents submitted as evidence by the parties.

In the early morning of December 17, 2009, Detective Brian LaBarge (Officer LaBarge) of the Burlington Police Department executed two search warrants that led to arrests of two

individuals who each identified Sara Robinson as a source of their Oxycontin.[1]  Officer LaBarge and multiple other officers went, in plain clothes, to Ms. Robinson's apartment complex.  When she returned to her apartment at approximately noon, Officer LaBarge and another officer approached her, identified themselves, and asked to speak with her.  They did not reveal they wished to speak with her in connection with a drug investigation.  (Hr'g Tr. at 29.)

The group moved to the main building of the apartment complex where Officer LaBarge and a third officer spoke with Ms. Robinson in a "snack machine area [] off [the] larger lobby area." (Hr'g Tr. at 10.)  Four or five other officers remained outside the room, which had glass panels in the door.  Id. at 33-34.  Officer LaBarge recorded the encounter.  They accused her of possessing and being involved with the distribution of Oxycontin.  Ms. Robinson denied possessing Oxycontin and stated that she was to meet with Detective Estes later that day.

The officers, knowing Detective Estes was a drug investigator for the Essex Police Department, contacted him and learned he had executed controlled drug buys from Ms. Robinson and she had not been, but was "arrestable."  Id. at 13.  The tape recorder was stopped briefly during the time Officer LaBarge left the room to ascertain what the other officers learned from Detective Estes.

Officer LaBarge returned to the room, reactivated the tape recorder, and spoke with Ms. Robinson for approximately 45 minutes.  Ms. Robinson was not advised of her Miranda rights at any time during this questioning.  (Hr'g Tr. at 32-33.)  Officer LaBarge also admitted she "probably" expressed the opinion she "should probably have an attorney," id. at 36, and that if Ms. Robinson had tried to leave he "would have more than likely arrested her or seized her and applied for a search warrant."  Id. at 40.  Ms. Robinson testified that, during the questioning, she was experiencing

---

[1] Oxycontin is a brand name of oxycodone.  See FDA Appl. No. 020553, available at www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm (last visited June 30, 2011).

withdrawal symptoms from lack of Oxycontin when the officers approached her, and had been ill with the flu. Id. at 52, 57-58. She told the officers multiple times she felt confused. Id. at 47, 56. She requested permission to use the bathroom, which was refused, id. at 43, and when she asked to smoke a cigarette, she was accompanied by an officer and escorted back to the room. Id. at 58. She did not feel free to leave. Id.

Officer LaBarge continued his discussion with Ms. Robinson with the "ultimate goal" of obtaining her consent to search her person, belongings, apartment, and vehicle. (Hr'g Tr. at 14.) He repeatedly explained that, in the absence of her consent, he could get a search warrant. Ms. Robinson eventually admitted she had a small quantity of Oxycontin in her purse and eventually -- at 1:14 p.m. -- signed a consent form to allow a search of her person, belongings, apartment, and car. Id. at 15, 17. An officer searched her purse and recovered four Oxycontin pills. Id. at 19. Officer LaBarge waited for a female officer to arrive to search Ms. Robinson's person. The female officer arrived and took Ms. Robinson to a private bathroom where she conducted a search and recovered 266 Oxycontin pills from Ms. Robinson's bra.

Following the search, Ms. Robinson was taken into custody and transported to the Burlington Police Department where she was advised of her Miranda rights, signed a waiver form at 2:34 p.m., and was questioned further. Id. at 21-22. She made additional admissions and, after "a couple hours," was taken back to her apartment where officers conducted a consent search and discovered approximately $9,000. Id. at 25-26.

III.   Discussion

An individual must be advised of Fifth Amendment rights before custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966). An individual has the right not to speak and to request an attorney while in custody and any interrogation must stop until an attorney is present. Id. at 474. The government bears the burden of establishing by a preponderance of the evidence that law

enforcement officers properly advised an accused of his Fifth Amendment rights and that he made a knowing and voluntary waiver of those rights.  Id. at 444; Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).  Here, the government argues Defendant was not in custody, so no Miranda rights were necessary, and her consent to search was voluntary.  (Doc. 21 at 8-9.)

Custodial interrogation has two components:  the individual is in custody and is questioned with investigative intent.  United States v. Rodriguez, 356 F.3d 254, 258 (2d Cir. 2004) (citing United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987)).  An individual is "in custody" if questioning was "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak."  Id. (quoting Morales, 834 F.2d at 38).  As in a Fourth Amendment analysis, to determine whether an individual is "in custody," the court must decide whether a reasonable person would have felt "at liberty to terminate the interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112 (1995).  In the absence of a formal arrest, the court must consider whether law enforcement officials acted or spoke in a manner that conveyed the message that they would not permit the individual to leave.  United States v. Ali, 86 F.3d 275, 276 (2d Cir. 1996).

The Court finds Robinson was in custody while she was being interrogated at her apartment complex.  She was questioned in a small room -- according to Officer LaBarge, a "snack machine area," (Hr'g Tr. at 10) -- by more than one officer, with the door closed, through which she could see other officers in the lobby.  She was not allowed to go to the bathroom and when she requested permission to smoke a cigarette outside, she was accompanied by an officer and chaperoned the entire time, then escorted back to the room.  A reasonable person would not have felt at liberty to terminate the conversation and leave.  See United States v. Valentine, No. 08-CR-6124L, 2009 WL 2952232 (W.D.N.Y. Sept. 16, 2009) (finding defendant was in custody when subjected to questioning without

4

any indication from the officers that he could end the questioning and walk out). Indeed, Officer LaBarge testified that if Robinson had attempted to leave, he "would have more than likely" arrested or seized her. (Hr'g Tr. at 40.) Robinson was "in custody" during the initial interrogation.

The Court further finds Officer LaBarge was questioning Robinson with investigative intent. This component of custodial interrogation requires the inquiry be "conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought." Rodriguez, 356 F.3d at 259 (citation omitted). The questions asked must have been likely to elicit an incriminating response. Id. Officer LaBarge testified he approached Robinson after she was identified by two others as a source of Oxycontin found in their possession that morning when Officer LaBarge and others executed search warrants. (Hr'g Tr. at 5-6.) His ultimate goal was to determine if she possessed Oxycontin. Id. at 14-15. As Oxycontin is a controlled substance, its unauthorized possession would be illegal, and coupled with the information that Robinson was a supplier, the questions were likely to elicit an incriminating response. Accordingly, Robinson was questioned with "investigative intent."

Based on the Court's findings that Robinson was both in custody and questioned with investigative intent, her encounter with Officer LaBarge and others at her apartment complex on December 17 was custodial interrogation and Miranda warnings were required. Robinson was not, however, advised of her Fifth Amendment rights at that time, so the interrogation at Robinson's apartment complex was in violation of those rights. Accordingly, any statements she made during that interrogation are suppressible. The government, however, has indicated it does not seek to introduce any of the statements she made during that encounter.[2] (Doc. 21 at 5.)

---

[2] Because the government does not seek to use the statements and the Court finds them otherwise inadmissible, Defendant's argument that the statements should be excluded because her request for an attorney was ignored is moot.

Robinson argues, as a result of the Miranda violation, all evidence and statements obtained by the police should be suppressed. (Doc. 20-1 at 1-2.) The government contends: (1) Robinson voluntarily consented to a search of her purse and person, and later her apartment, and Miranda warnings are not a prerequisite to an effective consent search (Doc. 27 at 8-11); and (2) Robinson's post-arrest confession is admissible because the officers did not use a deliberate two-step interrogation process, id. at 14-19.

In United States v. Patane, 542 U.S. 630 (2004), the Supreme Court held that failure to give Miranda warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced. Id. at 637-44. Accordingly, the Court must determine whether Robinson's statements and her ultimate consent to search were voluntary. The Court reviews the totality of the circumstances to determine voluntariness. The burden is on the government.

The Court has already found that Robinson was in custody. Multiple officers were present outside the room where she was being interrogated by Officer LaBarge and at least one other officer was in the small room at all times. The door was closed. (Hr'g Tr. at 10, 55-56.) Robinson testified that she was suffering withdrawal symptoms and recovering from the flu on the day of the questioning. Id. at 57-58. She often repeated she felt confused and thought she should probably have an attorney. These statements were ignored. Her requests to use the bathroom were refused. She testified Officer LaBarge told her if she consented, she could go to the bathroom and giving her consent would be the fastest way, id. at 58; otherwise he would get a search warrant. Id. at 15-16. Robinson was questioned for almost an hour and prevented from using the bathroom until a female officer arrived to search her person. Id. at 11, 13-14, 20. Under these circumstances, the Court finds the government has not demonstrated Robinson's consent was voluntary. Accordingly, the

Oxycontin officers found in Robinson's purse and on her person must be suppressed as well as the currency officers later found in her apartment.

Finally, Robinson argues her statements made at the police station should be suppressed as well. As noted, the government bears the burden of establishing by a preponderance of the evidence that law enforcement officers properly advised an accused of her Fifth Amendment rights and that she made a knowing and voluntary waiver of those rights. Miranda, 384 U.S. at 444; Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).

The Supreme Court has twice addressed the admissibility of statements after a Miranda warning but obtained subsequent to an earlier unwarned statement. Oregon v. Elstad, 470 U.S. 298 (1985); Missouri v. Seibert, 542 U.S. 600 (2004). Elstad focused on the voluntariness of the pre-warning and post-warning statements. Seibert, however, shifted the focus to whether the Miranda warning was effective. The Second Circuit has held Seibert lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used to obtain the post-warning confession. United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007). The Circuit recently applied the Carter analysis in United States v. Capers, 627 F.3d 470 (2d Cir. 2010), and affirmed the suppression of post-Miranda statements where a deliberate two-step strategy was used and no curative measures were taken to obviate the violation. Id.

To determine whether a deliberate, two-step strategy was used -- meaning Seibert would apply and not Elstad -- the Carter court analyzed factors such as the extent of the pre-warning questioning; the location of and time between the statements; whether the officer taking the warned statement was aware of the unwarned statement; and whether the post-warning questioning was a continuation of the pre-warning question. Carter, 489 F.3d at 536. In Capers, however, the Court concluded those "considerations . . . are by no means the only factors to be considered," and instructed "a court should

7

review the totality of the objective and subjective evidence surrounding the interrogations." Capers, 627 F.3d at 478-79.

Here, the totality of the evidence weighs in favor of suppression. The pre-warning questioning pertained to Robinson's possession and distribution of a large amount of Oxycontin. (Hr'g Tr. at 11.) The questioning led to an admission that Robinson had Oxycontin in her purse, id. at 15, and, as the Court found above, an involuntary consent to search. The post-warning questioning involved "everything that had gone on along with other information pertaining to Oxycontin and Mrs. [sic] Robinson as far as selling or her source of supply." (Hr'g Tr. at 21.) The statements partially overlapped in subject matter but the post-warning statement included Robinson's sources. Though the statements were made in different locations, at her apartment complex and at the police station, they were less than two hours apart, and were made to the same person, Officer LaBarge. On these facts, the totality of the objective and subjective evidence supports the finding that a deliberate, two-step strategy was employed to obtain a post-warning confession and, therefore, Siebert applies.

The Court next must consider whether any curative measures intervened to restore Robinson's opportunity to voluntarily exercise her Miranda rights. Here, the Miranda warning was not effective and Robinson's waiver will not be given effect because there was not a "substantial break in time and circumstances between the prewarning statement and the Miranda warning," and there was no "additional warning that explain[ed] the likely inadmissibility of the prewarning custodial statement." Siebert, 542 U.S. at 622. Officer LaBarge conducted both questionings and, as the officers had already recovered a substantial amount of Oxycontin from Robinson as a result of the involuntary consent search, Robinson would have no reason to know the statements and evidence could not be used against her. Accordingly, Robinson's statements made at the police station must be suppressed.

In its briefing following the April evidentiary hearing, the government argues the inevitable discovery doctrine renders the evidence admissible notwithstanding the constitutional violations.

See Doc. 27 at 11-14. The doctrine was recognized by the Supreme Court in Nix v. Williams, 467 U.S. 431 (1984), as an exception to the exclusionary rule. To prevail, the government must prove by a preponderance of the evidence that, absent the unlawful search, lawful discovery of the challenged evidence was inevitable. Id. at 444. In this Circuit, "illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006).

The government's argument is as follows: Officer LaBarge had sufficient probable cause to obtain a search warrant and would have done so in the absence of Robinson's consent to search her person, car, and home. Upon executing the search warrant, Officer LaBarge would have found the Oxycontin on Robinson and the money in her apartment. Further, Officer LaBarge had probable cause to arrest Robinson and would have searched her incident to her arrest, thus discovering the pills on her person and in her purse. Presumably, the money in her apartment would not have been found. (Doc. 27 at 12-14.)

The Court does not have a high level of confidence that lawful discovery of the illegally obtained evidence was inevitable. "[I]nevitable discovery analysis logically must begin with the progress of the investigation at the time of the government misconduct." United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992) (vacating conviction where district court applied inevitable discovery doctrine). The government has not provided evidence of a "sufficiently active or developed" investigation of Robinson. Id. Detectives received information she was a source of Oxycontin pills just hours before their contact with her. Further, it was Robinson who informed Officer LaBarge of her contact with Detective Estes -- Officer LaBarge did not learn that Robinson was "arrestable"

9

based on the controlled drug buys until she told him of a scheduled meeting with Detective Estes. The Court finds the government's investigation of Robinson was not sufficiently active or developed.

Further, in keeping with Second Circuit instruction, the Court notes the fact that an action could have been taken is "not necessarily enough to establish" that the action would have been taken. See Heath, 455 F.3d at 59 (referencing holding in United States v. Cabassa, 62 F.3d 470, 474 (2d Cir. 1995)). Indeed, Officer LaBarge himself testified variously that he "would have more than likely," (Hr'g Tr. at 40), and "probably would have," id. at 41, arrested Robinson in the absence of her consent.[3] Testimony of this nature does not give the Court the requisite high level of confidence. Accordingly, the Court declines to apply the inevitable discovery doctrine on the facts of this case.

IV.  Conclusion

For the above reasons, the Defendant's motion to suppress (Doc. 20) is GRANTED. Ms. Robinson's statements made to police at both her apartment complex and police station and the physical evidence found in the searches of her purse, person, and apartment are suppressed.

This case will be placed on the August 2011 trial calendar.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 30th day of June, 2011.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
District Judge

---

[3] The Court notes Officer LaBarge did, at one point, testify that he "would have" applied for a search warrant, (Hr'g Tr. at 27), however, this testimony does not carry the government's burden to show that a judge would have issued a warrant. See Cabassa, 62 F.3d at 473-74 (noting even where probable cause to support a warrant exists, the "residual possibility that a [] judge would have required a stronger showing" renders the evidence inadmissible).